May it please the Court, I'm Dwayne Bosworth. I represent Landphere Enterprises. There are three appeals, as you know, before you at this time. Landphere's appeal on the merits of summary judgment, Jiffy Lube's appeal on the attorney fee award, and Landphere's cross appeal on the attorney fee award. I'll cover each of these, though I believe that Landphere's cross appeal is logically prior, so I will cover that second. Landphere contends that the trial court abused its discretion in excluding the expert testimony in this case and on that basis granting summary judgment, which ended the case. We have pointed out multiple indices of this abuse. I think they could be summarized by saying that under the facts of this case, the court found itself taking on the role of expert. I say this because the central issue in this case regarding expert testimony was the relevance or the fit of the survey in question. In other words, whether it finally asked the right question. Oddly, that matter is inextricably intertwined with reliability. In other words, the central issue here of relevance was the reliability, the scientific reliability of the survey in question. And here is where the court found itself having to act as an expert and not, in fact, weighing conflicting testimony of experts. Let me give the first example. Over three experts' testimony about the central issue in this case, namely the flow of the questions and therefore what the last and most important question, JLAD 8, meant. The court found itself having to act as an expert when it considered what did the question, would you take your car to Landphere, mean? Was that the question? That was not the jackpot question, Your Honor. No, the jackpot question. I thought you were giving me the survey question. I guess maybe you're giving me the big picture question. No, I'm sorry. I am giving you the survey question. What was the survey question? I think you're jumping ahead to the ultimate question, which is known as JLAD 8. And, yes, you're absolutely right. In the June survey, it said, would you take your car to the dealer? Or did the statements cause you to go to Jiffy Lube instead of the dealer? In the September survey, the statements were, would you take, did the statements cause you to take your vehicle to Jiffy Lube instead of a car dealership? So I'm tracking with you absolutely there. And I didn't mean to get out. Are you trying to lead me there? No, not at all. I'm not objecting to the way you do it. I'm not sure I understood what you were saying. But it seems to me, in the end, the question is going to be, using the term reliability, which you used, did the question posed during the survey reliably report what the broad legal question or the evidentiary question would have to be in terms of the connection with a particular dealership? Yes, Your Honor. And I'm afraid I have skipped a step for you that I haven't made clear, I suppose. The testimony of the three experts about what those last two questions mean stems from their scientific, their technical, their expertise on the flow of the survey. In other words, as you see in their three declarations, they are talking about the jackpot question, in fact, does ask the relevant question because, as they explain in detail, the flow of the survey leads you to answering that this is a land fair matter. As a simple analogy, it's like if you tell someone coast, post, most, and ask them what you put in a toaster, they say toast, and that's because of the flow of what's happened. There are, in fact, volumes, it's shocking to me, there are tomes and tomes about the flow of survey, and that was their expert testimony here about why, in the flow, the question that was asked that had the dealer or had a car dealership meant land fair. What I was trying to get to is, in looking at that flow, that was the scientific question here. In looking at that flow, the court clearly got matters wrong or tried to become an expert itself. Let me give you the first example, which is that the expert testimony is that the question that led off the second survey was, would you take your car to this land fair dealership? Would you take it to Beaverton Honda? Would you take it to Newburgh Dodge, et cetera? And the expert testimony was that that is why the jackpot question referred to land fair. In looking at that, the court said, well, in the flow of the survey, the first question, as people were introduced, the consumers were introduced to the survey, was, I'm going to talk to you about places you would consider taking your car. And it was on that basis that the court said, would you take your car to land fair, was undercut. And the court said that in the face of three experts talking about the expert subject of flow. One of the things I tried to do here is, okay, how would I answer the questions if they were posed? And I thought I'd have them, but I can't find them now. Maybe you could just take me through, what's the threshold question that starts off this sorting process? Is that the question, would you, after the introductory statement, would you take your car to? Would you take your car? In other words, trying to determine whether or not you would take your car to a land fair dealership. So I answer yes to that question. Yes. What's the next question pertinent to this concern that I would get? It depends on how much detail you want to get into. But the next question that is pertinent at all is, how far away are you? That actually raises a concern, because one of the things cited by the district court was geography. And my wife for a long time drove a car, which for reasons I don't remember, she bought at a dealership pretty far from where we live. And so the thought of going back to that dealership for an oil change is kind of beyond the pale. But she's asked the question, would you consider going to whoever sells that kind of car nearby? She could answer yes. I don't know how she'd answer. So I take it that's what the district court had in mind in trying to figure out how did this question or whether this question sufficiently focused down to what's supposed to be the proper pool of people. Well, with regard to the scenario you just set out, I think that if, in fact, she answered this survey, yes, I would take it to the Beaverton, to the land fair dealer, then yes, she would be taking it to the land fair dealer. That's what we wanted to know. May I add, though, with regard to geography, the court did get hung up on the three corroborating reasons that the experts talked about, and geography was one of them. This was not, in fact, the basis for their statement that this was, in fact, a relevant question. But they said it's relevant because of the flow which we consciously, purposely designed. And it's beyond question, Jiffy Lube would agree, that the purpose of the survey was accurately stated by the two people who designed it. In other words, they got the purpose right that we're trying to determine if you went to Jiffy Lube instead of a land fair dealership. But these people who testified that we did ask the right question merely said that as corroboration, here's geography, here is distance, here is the other three factors that they talked about. But the court never got to the factor of flow except to get it wrong. For example, the court said that the question, would you take your car to a land fair dealership, because of this question which had preceded it, which is I'm going to talk to you about places you would consider your car. The court considered taking your car. The court acted as an expert over the uncontroverted testimony of the three experts that that question about I'm going to talk to you about places you would consider taking your car does not make the question, would you take your car to a land fair, ambiguous. So the court weighed in. To be honest about it, it seems to me that the experts whose background is in designing surveys, certainly I should know surveys better than anybody else, what we're really trying to figure out is the respondent's mindset. I'm not sure the district judge is a bad candidate to decide with how the respondent would hear that and respond to it. I mean, the experts have reasons to want to say what we do is the right thing to do, and presumably they have reasons for saying that. But the question I asked myself as I went through here, well, would this have gotten off track if I was trying to answer these questions? Well, and I think the problem is that what you would do, I believe, is you'd probably call the expert in, and you would try to understand the survey and the flow issue, which the three experts are testifying about. You'd probably have a proceeding to do that. And what you'd find then is you wouldn't make the other kinds of mistakes, the multitude of mistakes that the court made. Let me give you the Lulu, which is that the court, in trying to understand the flow of this, just as you're doing in imagining what it would be like, the court completely misunderstood the flow, and that is captured, for example, in the courts dealing on what's called VHIC 7. There the court said, and it's further proof that this is not the right question, because look at VHIC 7. None of the answers here say land fear. And the court, that was a crucial, a key part of the court saying this is not good science. And the court got that, and Jiffy Lube frankly concedes, the court got that flat out wrong. It's Jiffy Lube's position that it's harmless error, but you will see that it in fact is central to the court's opinion. The court did not understand the flow of the survey, completely misunderstood it, and did not understand that there could not be an answer to VHIC 7 that would provide an answer of land fear. So the court truly did not understand the flow of this. I understand what you're saying about what it would be like for the consumer, but that's where you have to bring in experts and ask them what it is, and understand and not have mistakes about the flow, completely flat out mistakes about the flow of this matter. Remember again that there was, we asked for oral argument on both the motion to exclude and summary judgment. Remember also that there was no, there was absolutely no expert contradicting anything that the three experts said. The court did not consider one of the experts inexplicably, but as you look at the record you will see that expert actually is testifying, excuse me, on the issue of, on the scientific issue of flow. The court also mischaracterized the one expert who said that he did not, he misunderstood the questions in deposition. If you will kindly take a look at his declaration, you'll see that that is not the case at all. He did not misunderstand the question, he is a gentleman who has a pocket protector at all times, he is very serious about his science, and he answered the questions precisely as is explained there. The court moved to things like geography, which again, by the way, it mishandled each of those as we've described in our briefing, but it did not understand the flow, which is the real reason why these were the right questions. There are additional things that the court simply did not understand. The court, for example, in the June survey was quite concerned that it didn't prove that someone would go to some other service center, such as an oil can Henry or the neighbor or some other mechanic, but again, a simple hearing or anything would have shown that that is a complete misunderstanding, because the question was instead of a car dealership or instead of the dealer. So the court's misunderstanding about, well, you didn't prove that you wouldn't go to a neighbor or some other jiffy spot, again showed that the court did not understand this survey. The court made other factual mistakes, and I won't list them all, but for example, the court decided that Respondent 31 did not recall hearing of any of the allegedly false statements. That's absolutely wrong. It's at ER 78. Respondent 31 did state that he heard two of the statements in question. So there just are a plethora of actual mistakes here that it is our contention amount to an unfortunate example where the court, without the benefit of anything else, found itself acting as an expert, and that led it to that's the situation that leads it to make these kinds of errors. I could provide other examples, but I see that my time is running down, so I need to know if you would like to talk about the attorney fee issues also. I'm assuming, I think the first, the cross appeal issue presents quite an interesting intellectual question. We have Kona here, and Lanphier certainly understands that this panel lives with Kona. I understand that, but the question is Kona clearly stands completely alone right now. It is the only diversity case in which there's a declaration that there's no subject matter jurisdiction, and yet one can go on to address attorney's fees. There are lots of other cases that make analogies. There's the Steele case that's been discussed that's a federal question case. We get mixed up about other specific congressional grants of jurisdiction like costs under 281919 and like removal 1447. There are other specific congressional grants of jurisdiction that allow the consideration of costs or attorney's fees, but there is no such independent grant here, and so the question before this court is its comments with regard to the unique position of Kona, having said there is no subject matter jurisdiction, which is the case here, and yet we're going to go on to do attorney's fees. So that is the nature of our cross appeal, and I understood that you will make your comments on that, and then if we can, we can move on to, we can ask perhaps for an in-bank consideration of that incredible issue, which is not covered by Wright Miller or anybody else, oddly enough. The last issue is the issue of discretion, and in short, the Jiffy Loop's position is that the court failed to consider the 16 factors that are set out under Oregon law, and I think you'll see in the opinion that that's absolutely not true. The court, in fact, laid out each of the 16 factors. The court specifically stated that it must consider each of the factors. The court specifically stated the Oregon law that it need not write about or fully address all of the factors, that it needs to address those which it deems relevant to the decision. So there's no issue with regard to whether the court failed to consider the proper factors in this abuse of discretion situation. It did. Second, the question concerns Oregon law and apportionment of attorney's fees between a fee-bearing and non-fee-bearing matter, and the Jiffy Loop would urge that if there's any overlap, then you provide all of the fees in the overlap. That is clearly not Oregon law at all. In fact, Oregon law relates to and allows the court to be guided by what was necessary to achieve the result that was achieved. I think that provides a broad overview. I would reserve my last two minutes if I might. You may. Thank you. May it please the Court, my name is Charles Hinkle. I'm here representing Jiffy Loop International this morning. Jiffy Loop moved for summary judgment based on four of the elements of an intentional interference claim. The district court granted that motion based on two elements, causation and damages. We point out in our briefs that the other elements are there as well, and the judgment can be affirmed on those alternate grounds. I hope the court does reach those alternate grounds. I don't think it needs to.  I wonder if counsel for Lanphier would have said anything different here this morning if this had been de novo review. He, in his briefs and in oral argument, wants this court to really function as the gatekeeper. But that is not this court's function. This court's function is to review whether or not the district court abused its discretion in acting as the gatekeeper. Last June, Judge Clifton wrote an opinion for this very same panel, actually, in the Handgarter case. And in that case, that involved a chiropractor and a lawsuit against an insurance company. I confess they were together after a while. And one of the questions in that case was expert witness, whether the expert was testifying about the standard practices in the insurance industry. The plaintiff in that case had gotten a $7 million judgment against her insurance company. But, Judge Clifton, you wrote, the judges are entitled to broad discretion when discharging their gatekeeping function. The trial court not only has broad latitude in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability. So broad discretion, broad latitude. In Kumho Tire, the U.S. Supreme Court used the phrase considerable leeway. Your function is not to In the prior case, that's a trial situation. We were dealing with an attempt by the insurance company to overturn the result of the trial. Of a trial. We do have a context here, the summary judgment. What difference does that make? Oh, it makes no difference at all, Your Honor, with respect to the gatekeeping function. Mukhtar, I believe, was a summary judgment case. There have been a number of summary judgment cases in which the question of the district judge's gatekeeping function, evaluating whether to admit or exclude expert testimony, is no different on summary judgment than it is at the trial. And as important as what the U.S. Supreme Court said in General Electric v. Joyner and in Kumho Tire, as important as what it said is what it did in those cases. Because in both of those cases, the district court had excluded expert testimony. Both had gone up to the Court of Appeals in both cases, as it happens. It was the 11th Circuit. The 11th Circuit had reversed in both cases, saying to the district judge, you shouldn't have excluded that. And in both cases, the Supreme Court reversed the 11th Circuit, saying you did not give sufficient deference to that trial judge. It's the trial judge who has that gatekeeping function. So I think it's important to remember that standard of review here, Your Honor, and not just the merits of what the trial judge did. The second point I'd like to make is that there's no magic about being a survey. Surveys are subject to the same criteria in evaluating their reliability and their relevance as any other kind of expert testimony. And that brings me to the third point. What did this trial judge do? Judge Brown didn't issue a two-page cursory opinion saying, that looks like junk science to me, I'm not going to consider it. She issued something like 55, almost a 60-page opinion, analyzing this survey in great detail. And what Mr. Bosworth described this morning, accurately, I guess, as the jackpot question, is the key part of Judge Brown's analysis. And let me quote to you what Mr. Bosworth said to you just a moment ago. He said their expert, Dr. Posdina, in his deposition, fully understood the questions and answered them precisely. So let me read you what Dr. Posdina said about that jackpot question. This is in the supplemental excerpt of record, page 20. Dr. Posdina said, We cannot demonstrate that they, the survey respondents, would have chosen definitively Landfear over an alternative dealership. Jiffy Lube's lawyer, I think somewhat incredulous that Posdina had made that admission, said, you're really saying that? You are unable to conclude that statements in the advertisement caused people to go to Jiffy Lube instead of a Landfear dealership, correct? You are unable to conclude that. And Dr. Posdina said, yes, I believe that's correct. This survey that I just took does not show that any respondent went to Jiffy Lube as opposed to a Landfear dealership. That is Dr. Posdina's own testimony. So when Judge Brown and the court leveled us, I think that's true in terms of describing actual behavior because the questions, as I understood them, were being put to the survey respondents in a more hypothetical present tense form. Yes. So he may be saying, and I'll go back and take a look at that, it seems to me he might be saying, look, I'm not saying that whoever number 34 was, his behavior was actually changed in the past because I don't think a survey could give him that information. Are you confident that he's actually responding to that question more broadly than that? Well, I'm sure, Your Honor, you will read that page. I think I am characterizing it accurately. The deposition, after all, was about the survey, was about its reliability, about the logic, the flow of the questions, as counsel for Landfear said, and I think that was the gist of his admission. What the district court said, what Judge Brown said, is that the logic was to ask respondents, would you have gone to Landfear as opposed to Jiffy Lube? But she said the survey questions posed to the customers did not track that logic, and that, we think, is an accurate conclusion. In fact, the jackpot question in the September survey didn't say, would you have gone to the dealership? It said, would you have gone to a dealership? It didn't even refer back to the specific Landfear dealerships that had been questioned earlier, that had been specifically cited earlier in the survey questions. So the jackpot question didn't answer the question that Landfear had the burden of showing. Remember, Jiffy Lube moves for summary judgment on showing that there is no evidence of causation and damages. They come in with their only evidence of causation and damages being this survey, and that jackpot question doesn't show causation or damages with respect to Landfear. It may have shown that some respondent listened to some ad and may have gone to Jiffy Lube instead of to some dealer for some kind of service, but not that they were diverted from a Landfear dealership. And one more word about the ambiguity of the opening questions about Landfear. Would you take your car, would you consider, this was the opening question, would you consider taking your car to Landfear for service? Well, most anybody would say yes. Sure, I'm a reasonable person. I'd consider taking my car to Landfear for service. But for what kind of service? They never ask that. I bought my car from a dealership like your wife, Judge Clinton, a 30-minute, 40-minute drive from where I live. I would consider going back to the dealership for my 50,000-mile checkup or whatever, but not for a routine every-other-month oil change. I'm not going to drive an hour or 30 minutes and leave the car in a dealership when I can get it done in 20 minutes at my neighborhood Jiffy Lube. So even those setup questions did not distinguish between the kinds of service that they said the respondents would consider going to a dealership for. Let me take a step back and express to you the largest concern I have from your perspective. I'd like to ask you to speak, too. And that has to do with how precise or narrow or completely focused evidence has to be to be sufficiently supportive to, in this case, to win admissibility as an expert report or to fend off summary judgment. I start with damages because that's the one where I think courts have recognized pretty commonly that exact proof of damages in a lot of contexts, not possible. You can't figure out what lost profits would have been because you can't recreate all the circumstances that existed. And so the courts have, we adopt terms like reasonable certainty. What we really mean is that there's a broad range. If you can establish there are damages in this neighborhood, that's going to be enough to support a judgment or a verdict, as the case may be. You can't be wide open. There needs to be some reasonable certainty, but it's not narrow certainty. And I ask myself, as I do these things, okay, what would I have done at the time? I was in your position not all that long ago. What would I have done trying to prove up this if I had a claim like this? You're not going to be able to recreate the world, how people actually would have behaved if they hadn't heard these ads. And so you improvise. Why isn't this a fair improvisation to try to approximate, to illustrate what fairly could have expected to have happened if the circumstances had been different? Well, you know, Your Honor, I tried to find a case in which a survey had been used to prove damages. Surveys are normally used in confusion cases. Did you look at this ad and think, oh, gee, that's Microsoft? And it wasn't Microsoft, it was some other, you know, and you buy something else, you're in confusion. You thought you were buying Coke and actually you were buying Pepsi. There are lots of cases like that. There aren't many cases, I couldn't find a case right on point with respect to the use of a survey to prove damages. I think that in the proper case, a survey could be used to prove damages. I'm not here arguing this morning that Landfear should have paraded in every one of those 34 customers and said, yes, I went to Jiffy Lube instead of to Landfear, although it does raise the question if there were 34 of them and they knew who they were, why didn't they get their affidavits and say, yes, I did, I was influenced. But, you know, in the abstract, I would certainly agree that a survey might be admissible and probative on the issue of damages, but it's got to be a survey that asks the right questions. It's got to be a survey that tracks the particular issue at stake. You know, when Mr. Bosworth says, well, this court in Southland-Sod said that surveys are generally admissible, that's like saying photographs are generally admissible or handwriting analyses are generally admissible. Yes, as a genre of evidence, they are generally admissible, but not if they aren't relevant to the point at hand. Let me take the next step, which suggests, okay, what's the standard of relevance or how precise does the survey need to be? Well, that jackpot question, Your Honor, wouldn't – why wasn't that jackpot question, did any of these ads not – you know, what they said was, did any of these things – and that's the wrong way of saying it, because these things may have included background noise, all the other reasons that I had independently of these ads, why I would never have gone back to land fear or geography, distance, whatever. But anyway, the jackpot question said, did any of these things cause you to go to Jiffy Lube instead of to land fear? Why didn't they ask that? That would have made this survey at least somewhat more probative, but the best question I submit to you and the question that is really dispositive and should have been asked, did you hear this ad, did it cause you to go to Jiffy Lube instead of to land fear? But they never asked that question. Well, they accept the proposition that they could have done it better, and in retrospect, there are all sorts of things all of us could have done better. We don't have a best evidence rule with regard to evidence generally. And you can have imperfect evidence if it's sufficiently reliable, so on and so forth, and we take things as they come. So even if we accept the proposition, which I think is probably true, that it didn't focus in as precisely as it could have, why is this so far away that it doesn't even qualify for possible consideration by the prior effect? I think there are two answers to that, Your Honor. The first is that I think Judge Brown demonstrated, analyzed it correctly, that the logic, that the questions didn't track the logic. The logic that Dr. Posdina posed for himself was perhaps the correct logic, the correct goal, but the answers, the questions that he posed didn't get there. There's a cause and effect problem there. Secondly, Your Honor, and I'll reiterate the point that I made at the beginning, this was not a snap of her fingers judgment by Judge Brown. She analyzed this in 55 pages. She read this stuff, and she analyzed it very carefully. I think what you're asking, what Lanphier is asking you to do, and with all respect what some of your questions are asking, would be appropriate if this were de novo review. But what is the purpose of saying that a trial judge has great discretion and great latitude and great leeway, what's the purpose of that? What was the purpose of the Supreme Court, in the only two expert opinion cases that it has issued since Daubert, reversing the Court of Appeals twice and saying, wait a minute, you've got to give more deference to the trial judge. He or she is the gatekeeper. What is the point of all that if we're going to ask the Courts of Appeal to analyze these things de novo? I have been focusing on that jackpot question. Our brief shows that and lists, catalogs, the various other errors that Judge Brown found. There were alternate grounds even for excluding the survey that she did not reach. Perhaps the most important one is one I've alluded to already. They did not test the actual statements from Jiffy Lube ads. They gave paraphrases. One vivid example is one of the ads said this, and you know what, it doesn't help that the dealership is only open when I'm working. Sort of a fluffy rhetorical hyperbole. In Lansphere's transformation of that, it says, the question in the survey was, have you heard a Jiffy Lube ad say that car dealership service departments are not open evenings to do oil changes? That statement never appeared in any ad. It is their rather generous reconstruction and restatement of that ad. There were leading questions. There were no questions that corrected for background noise. There were a number of other problems with the survey, Your Honor, and they are categorized, set out in our brief. If you like the survey, and if you conclude that Judge Brown abused her discretion in excluding the survey, there are other alternate grounds for affirming summary judgment, and those go to the other two elements of the intentional interference claim. Remember again that we move for summary judgment not just on causation and damages, but on the lack of improper means and a lack of improper purpose in broadcasting these ads. There was no improper means because there was no falsity. I'm not going to go through that evidence. We have it in our brief. No improper purpose. We're advertising. We're trying to get customers. There wasn't anything nefarious going on here. So I think there are adequate alternate grounds for affirming, even if you don't like what Judge Brown did with respect to the survey. But with all respect, Your Honor, keeping in mind the appropriate standard of review, I think you should affirm on that fundamental ground of the exclusion of the evidence. Finally, just let me say a word about the attorney fee appeal. I think Lanthier's problem there is that it has confused Article III jurisdiction with the ability to state a cause of action under a statute. Federal courts do not use or lose their Article III subject matter jurisdiction just because a plaintiff doesn't have standing under a statute. And I submitted a 28-J letter last week pointing out that in the antitrust case context, that is certainly true. A plaintiff may lack antitrust standing because he or she is not within the scope of the Sherman Act, the Clayton Act, or whatever, but that doesn't mean the federal court has lost subject matter jurisdiction to consider that case or to grant supplemental relief or to grant attorney's fees in an appropriate case. And I cited in my 28-J statement a concurring opinion by Judge Tashima recently in one of the U.N. Bank opinions in which he talked about that with respect to moot cases. When a case has become moot, the court retains subject matter jurisdiction to consider attorney's fees. There's no reason the rules should be different with respect to standing because standing and mootness are both simply aspects of justiciability. And, in fact, mootness is a more fundamental problem than standing is with respect to Article III jurisdiction. So we are here this morning, Your Honors, to ask you to affirm the trial court judgment with respect to the merits of the case but to reverse on the attorney's fees issue because we think that the court did have jurisdiction to grant the attorney's fees, as Judge Brown said, but that she abused her discretion when she did not award us fees for the full amount of the time that we necessarily incurred in responding to both of Landfear's claims. Just one word on that. It was Landfear who brought that statutory claim. It was Landfear who insisted from first to last that they had standing to bring that claim. And now they're faulting us for having defended against that claim and for incurring attorney's fees to defend it. Well, they shouldn't get away with that. They're the ones who were responsible for having brought that claim. They lost. They should be responsible for our attorney's fees. Thank you. Thank you, Your Honor. I want to point out just a couple of quick things. Mr. Hinkle, I think, quite inadvertently has misrepresented the record with regard to telling this court that there was a question about would you consider taking your car to Landfear. There is no such question. I just want to point out that that is not the record at all. Second, as the court discussed, you will go back and take a look at Dr. Pazdina's testimony with regard to whether he was suddenly admitting that, in fact, his survey was worthless. And I would ask you to look at that testimony and also at paragraphs 27 and I believe it's 28 of his declaration in which he's absolutely incredulous that someone could be interpreting his answers as conceding that the survey did not ask the right question. He explains that in substantial detail. Mr. Hinkle wants to talk about the 59 pages of the opinion. The pages in question here are pages 29 to 42, 13 pages. And without going too far on a limb, I'd like to say that I believe that each page has a substantial error in it in which the court is flat out getting the facts of the survey and the results of the survey wrong. It's for that reason that I recognize that I'm here under an abuse of discretion. But because each of those pages has the facts wrong, it is our contention that, in fact, that is an abuse of discretion. Finally, I think Mr. Hinkle's speculation about, you know, how this could have been done better is precisely illustrative of the problem in this case. For example, the question is asked, and I think the court essentially, you can read, was asking it, why didn't this thing say landfear? Well, again, let's have a little hearing. We would find that out in about 30 seconds. In the first survey, for example, we're talking about the dealerships are Beaverton, Honda, Newberg, Dodge. These people, consumers, don't have any idea even that Landfair owns the Newberg dealership. You cannot say Landfair. And, in fact, the very simple explanation, the surveyor ethically does not know which, in fact, dealer that Landfair customer went to. So there's a very simple, practical answer as we speculate that this could have been done better. Similarly, there's a very simple answer with regard to the car dealership, the use of the word car dealership in the second survey also. And these things are easily determinable. And, in fact, again, the speculation, for example, that these things is a poor phrase, is only, frankly, the ipsy dixit of the lawyer and not anything that you're hearing from a controverting expert. This case is unlike every other exclusion of evidence which is in this circuit or any other circuit. Thank you. Thank you. We thank both counsel for their arguments. This case is submitted and will now move to the Landfair v. Landfair v. Landfair
judges: Goodwin, Tashima, Clifton